Good morning, Your Honors. It may please the Court, Ethan Nutter for Plaintiffs, and I'd like to reserve three minutes for rebuttal. The question before this Court is whether 8 U.S. Code Section 1252-F1 deprives courts of all authority to compel the executive's compliance with its own policies regarding the U.S. border. And because Section 1252-F1 is not so broad, the District Court erred, and in this case, the courts can compel compliance with this policy that would allow noncitizens to wait in line for processing without the fear of being turned back to Mexico to wait in dangerous and squalid conditions. Now, I want to start with kind of what is undisputed about this, is that the government agrees this is a binding policy that the government is required to follow. Looking at 2 ER 104. Where is this policy, where is it set down? So it originated in a November 2021 memo, where the government said, you know, the policy is that once Title 42 ends, noncitizens must be allowed to wait in line. And then that, when Title 42 ended in May of 2023, was reinforced in the preamble as part of the Circumvention of Lawful Pathways Rule, and it was also promulgated to OFL personnel through musters and training in the weeks following that. So is this policy reflected in a regulation, or is it just in policy documents and in the preamble? So it's primarily in the policy documents and the preamble. If it were to be made a regulation, one of the things they have to do in a notice of proposed rulemaking is put the statutory authority for the regulation. What would the statutory authority be cited for this? Well, so the government has maintained that this is part of their broad statutory authority to control the flow of immigration at the border. Particularly they've cited 6 U.S. Code, I guess, 211G, about the CBP's powers. But they... That just assigns the powers to them. The powers are recited in the INA. Well, that's one of the sources of authority, yes. But the government has maintained that Section 1225, the key section that the government argues here, does not require any duties to non-citizens on the Mexico side of the border. Whereas this policy does. This policy says how the government will treat non-citizens who have not crossed the border. And that's been the government's consistent policy, is that Section 1225 doesn't apply across the border, but this policy does. And what's clear is that the government is not following this policy. So even the government's... Isn't it a policy about what's going to happen to people who will eventually make it to the border? I mean, this is a policy about how to exercise the processing authority at the border, ultimately, isn't it? So it does potentially have a collateral effect on processing. Not collateral. The policy is a policy about processing people at the border. It isn't like, here's a substantive asylum rule, or here's a rule about cancellation that then has a collateral effect on processing. This is a rule about, or a policy about processing, which is what F-1 is all about, isn't it? Well, no, Your Honor. So this policy does, it predates the actual processing. And that's the key. Under this court's precedent for the collateral effects, the question is whether it is one step removed. And here, yes, primarily the goal is to be processed and inspected. What comes from those cases, from footnote four of the Supreme Court's case, and from Gonzales, what comes from that is you're anchored in an injunction that is directed at a statute that's not in chapter four. And that's not what you have here. You have a policy about exercising the chapter four authority, so it's embedded within chapter four. No, Your Honor. We disagree. And one of the reasons is that the government doesn't promise inspection and processing if you wait in line. The policy that this injunction would enforce would simply allow non-citizens to wait, but it doesn't guarantee inspection. Non-citizens may choose to leave the line for their own reasons. This policy does not guarantee prompt. If an asylum seeker successfully waited in line, was not turned back at the end of the line, then pursuant to what you're requesting, would there not be an obligation on CBP's part to actually conduct the inspection? So yes, CBP's obligation under the statutes is to inspect and process, but the specific injunction that we're seeking does not compel that. And that's one of the key distinctions. For instance, so this court's precedent makes clear that the collateral effects is not limited to just the substantive eligibility questions. For instance, in Gonzales with a Z, the... It doesn't compel the processing, so when they get to the front of the line, then they can turn them away? I don't understand how it doesn't do that. Well, so the particular injunction would not require them to actually process them. The policy allows the CBP officers to process in order based on operational capacity, or even close the port if operational needs require it. And so the actual... The text of the injunction that plaintiffs are seeking is about that pre-processing step. Now we agree that the statutes themselves would require processing in those situations, but the injunction itself would not. Is that what we look at then? Trying to understand what the object of the injunction bar is. Is it the injunction? Is it the policy? How do you understand that? So the object of the injunction bar under Aleman-Gonzales is the effect on the processes carrying out the covered provision. And here, the actual injunction is an antecedent step to the inspection and processing. You have an APA challenge, for example, that comes right at 1225 that says that actually one of the other reasons that they're required to do this, aside from the Accardi claim, is that 1225 requires it, right? That's correct. And in that case, plaintiffs are just seeking declaratory relief. We're not requesting an injunction under that. How is that a different theory than the theory that motivates your injunctive relief? The declaratory and the APA claims are broader. Here we're focused on this narrow pre-inspection time when noncitizens are waiting at the border. And just for clarification, the Gonzales case in 2020 was about immigration detainers that were issued prior to detention and arrest under section 1226. And this court reasoned that because that is an antecedent step and that detainer authority is not grounded in section 1226, an injunction on detainers is permissible, notwithstanding that an arrest might be the consequence of a detainer. And so that's exactly what we have here. We have this injunction that operates on the pre-inspection and processing, waiting in line, the rights that the government has granted to noncitizens that says, we will not turn you away. And that injunction can compel compliance with that policy. But we've stopped short of asking for the actual compliance with the inspection and processing duties. The guidance doesn't mention waiting in line, so I'm just, I'm confused as to how your proposed injunction is actually enforcing the guidance. Maybe you've already tried to answer it, but I don't understand the answer. So Your Honor, the guidance does mention waiting in line. So at 2 ER 258, the guidance says, in all cases, however, undocumented noncitizens who are permitted to wait in line if they choose and proceed into the POE for processing as operational capacity permits. So that's what we're focusing on, is that portion of the policy that allows noncitizens to wait in line if they choose. And the government has argued that there is a one-to-one connection between waiting in line and inspection and processing, but the record shows that that's not true. So noncitizens, named plaintiffs in this case, have sometimes decided that they don't want to wait in line because the government is not processing people expeditiously. Or Mexican authorities sometimes exercise their own authority and clear the line. But I do want to be clear, this injunction would prohibit U.S. officials from using Mexican officials to remove people from the line. But that's the only way that that would affect that, is under the classic Rule 65, an injunction runs against those acting in concert. This isn't a line for handing out food. This is a line to be processed for entry into the United States. Yes, and it's an important right that the government in this policy has reiterated, that noncitizens are allowed to wait in line. And why that is important is because of how dangerous it can be to wait in northern Mexico compared to the relative safety of waiting in line, which is no picnic. But the record is replete with examples of kidnapping. The government put a Straus Center report in its own filings that mentioned, you know, two ERs, I think they're on 168, that, you know, 114 migrants were found after being kidnapped by the cartels. Isabel Doe, one of the plaintiffs, her husband was murdered on the way to the airport trying to go actually to Canada because she had been turned away previously from the U.S. But even after that, the government was still not allowing people to wait in line, and so she had to return back to northern Mexico. And that's the kind of danger that noncitizens are facing and why this injunction is important and why compliance with the government's own policy is the bare minimum that the government can do. How does the U.S. government, can you just add a little more detail to how the U.S. government enforces or doesn't enforce the waiting in line in another country? So, my understanding based on the record is that primarily U.S. CBP officers are placed at the borderline, and they, when they interact with noncitizens, will tell them, you cannot wait in line. Some of them say you can't be processed without a CBP-1 appointment. But for example... So they're in Mexico and going down the line in Mexico and talking to people, what is your claim? So the claim is U.S. Customs and Border Protection officials or OFO officials are telling noncitizens on the Mexico side of the border that they cannot wait in line. And how is that, how can they enforce that? Well, so for example, for Luisa Doe, at 2 ER 329, CBP officers said, you have to leave or we will call the Mexican authorities to remove you. And so that's the kind of explicit threats that not allowing noncitizens to wait in line. So the Mexican authorities allow the CBP folks to come into Mexico and go however long into the line and talk to people on the line and kick them off? I think primarily the CBP people stay on the U.S. side of the border, but it does depend a little bit. But then when noncitizens approach the port, for example, Luisa Doe was not allowed to wait in the line. She was told, you have to leave. Where was she when she was told? She was on the Mexico side. And a U.S. official was on the Mexican side? I think, I don't know if the particular affidavit is clear about the CBP officials' location exactly, but it's right at the border, either I think on the U.S. side in that case. So, Mr. Nutter, I guess this is a puzzle about trying to understand both sides' reading of this 1252 and its scope and then kind of what's left after that. I presume that one of the purposes behind 1252 is to avoid courts from reaching too broadly into sensitive executive branch decisions about immigration and, in this case, what's actually happening in another country. It would be strange, given the presumptions against extraterritoriality and others, to say that the way that you get around that is by establishing that this is not happening in this country, that essentially you're asking for an injunction whose primary impact is in another country. How do you square that with the purposes behind 1252 and our usual hesitancy and presumptions against extending the judicial power extraterritorially? So I don't think that this judicial power would extend extraterritorially because it would be aimed at U.S. persons and their conduct. And because Article III courts have personal jurisdiction over U.S. officials, that authority can extend wherever the official acts. And here, for the purpose of 1252F1, that's with the backdrop that to strip district courts and circuit courts of their Article III equitable powers requires the clearest command under Califano and the Supreme Court's decisions. And so we're really talking about how do you analyze the scope of 1252F1? Because Alamán-González does make clear that 1252F1 is a clear command stripping equitable authority. It's not a complete stripping of jurisdiction, but that's a different question. But here, the scope does not extend to policies that aren't implementing the covered statutes. And here, the government has chosen to promulgate this policy. It does not extend to policies that are not implementing the covered statute, but this policy does seem to implement the covered statutes. Because it's a policy about how they're going to process people at the border and how they're going to manage the line of people who are approaching the border for processing. It's inherently tied to that power. No, but it needs to be directly tied to that power. And that's this court's González opinion again, the 2020 González, where the government had argued that the immigration detainers were a helpful tool in their 1226 arrest and detention policies. But this court recognized that nonetheless, the detainer itself was not part of that statute. And so an injunction could run against the detainer in that case. But I guess that brings us back, and you're right, the guidance does speak to waiting in line. But it's waiting in line for what? It's to be inspected. It's not just waiting in line for the sake of waiting in line. That's right. But that's kind of the same question in González with detainers. It's not a detainer just to hold them for any reason. It's a detainer to arrest them under 1226, but that's the difference in what González with an S in 2007 says, is one step removed from the covered provision. And that's the key, is that there is one step removed from the waiting in line here to the actual inspection and processing under 1225. Just a procedural question. The only issue, as I understand it, that we have in front of us is the issue of preliminary injunction. So we don't have any issue related to declaratory relief or whether declaratory relief is covered by F-1. All that is still in the district court and not part of this appeal. Am I reading that correctly? That's correct, Your Honor. Okay. This is solely the preliminary injunction under the Accardi claim. Okay. And so there was no aspect in the request that was resolved by the district court's order relating to declaratory relief. It's just injunction. That's correct. And so just to reiterate, one thing to clarify the scope of this, looking at other statutes that limit equitable authority, the Tax Injunction Act and the Anti-Injunction Act, and the Supreme Court under the Tax Injunction Act in direct marketing, the BROL, was interpreting a similar provision. And I want to read it just to be clear that the Tax Injunction Act, 28 U.S.C. 1341, courts shall not enjoin, suspend, or restrain the assessment, collection, or levy of any tax. And the issue in direct marketing was information reporting requirements that Colorado had imposed that would have helped with assessment. But the Supreme Court said that the Tax Injunction Act does not apply because that information reporting is antecedent to the assessment. Even though it might be helpful to or related to, the injunction was still permissible in that case because it operated prior to the statutory phrase assessment. And here where the policy is operating prior to the statutory phrase, the operation of Section 1225 in this case. Can I save some time for rebuttal? Yes, Your Honor. And with that, we ask you to reverse. All right. We'll hear now from Ms. Shinners. You may proceed. Thank you. Thank you. Thank you, Your Honor. Good morning, and may it please the Court. Katherine Shinners on behalf of defendants at police. The class-wide injunction, Plaintiffs Seek, is precluded by Section 1252F1, even if plaintiffs are seeking to enforce a self-imposed requirement that noncitizens be permitted to wait in line at the border. Plaintiffs have made several concessions in their reply brief and here at argument as to the limits of what their requested injunction would do. And although the government appreciates those concessions and that they are seeking to define the term turn back to just relating to what CDP officials say to people who seek to wait in line to be inspected and processed, and they clarify what precisely they're seeking to enforce in the November 2020 guidance, I do want to point out that these were not fully developed or clearly laid out in their briefing before the district court, and certainly not in writing, and certainly not as clearly as in their reply. But regardless, the district court's decision was correct, and I do want to focus a bit on what plaintiffs requested before the district court in their briefing, because it does demonstrate the close causal relationship, as Your Honors have recognized. Do you think that the limitations that you've just referenced from the reply and at argument would make a difference to the outcome? No. No, Your Honor. I just, the, I, I... Because it would seem that if they had, you know, a blunder bus or overbroad request and the district court rejected it and it gets clarified in the briefing here that that might be an argument to send it back. No, I, I, if the, it does not make a difference to our argument. It's the, the argument that we presented in the briefing is correct, and the district court was correct in that even with those concessions, the act that the requested injunction, the acts of the requested injunction would seek to enjoin would impose requirements on the government to implement covered procedures. And I, I wanted to focus on what they requested just to show, one, the, the, the extremely close causal relationship between, between a no-turnback directive or allowing individuals to wait in line to be inspected and processed and imposing a requirement inspection and processing. The second reason why that's important is because it shows that even if you're seeking to enforce the government's own policy, there, just like with the implementation of statutes, there are disagreements over the potential scope of what that policy even means. So it's important that, although plaintiffs emphasize that the, this is the government's policy that they're seeking to enforce, that there, that it still falls within the scope of Section 1252F1, and that there is a reason, there's a good reason why that should not be carved out from Section 1252F1. What's your answer to Judge Collins' question for your, your friends on what the statutory authority would be if you were asked to give it, which I will ask you to do now? The guidance implements both the general authorities of the government and the, and some specific procedures, including procedures under 1225. As noted in the brief, the guidance is about the management and processing of non-citizens. And in this context, the non-citizens are arriving non-citizens without documents sufficient for admission. And when, when the text of the document refers to processing, it is referring, and plaintiffs do not dispute this, to procedures that are governed in the first instance by the covered statute 1225. How do you distinguish that from the arguments, I believe you've made elsewhere, that 1225 does not apply to people waiting in another country? That's correct. Although the government is not required to, the, the scope of 1225 in the government's view does not extend to individuals who are waiting in another country. Okay, so why isn't this a collateral effect rather than a direct effect, given that concession? Right, the, the very, the, even if there's, even if the no-turn-back directive is not directly inspecting and processing someone, the act of the no-turn-back, enjoining, enjoining, I apologize. Well, you've, you've put yourself, the government's put itself in a difficult position, I think, by arguing one thing in one all-ultra-lato case and another thing in another all-ultra-lato case with respect to the scope of 1225, hasn't it? I apologize, Your Honor, and I'd like to, to elucidate a position. Please. The, the, even if the authority for saying, or permitting people to wait in line, even if that is not an, an implementation of inspection and processing, the relationship here cannot get any closer. There's no closer relationship between requiring the procedures of inspection and processing and permitting those individuals to wait in line for inspection and processing. The very purpose that those individuals are waiting in line is to be inspected and processed, and the class definition in this case, or the proposed class definition in this case, are those who claim to have been denied access to the asylum process. Plaintiffs define that as, define access to the asylum process as inspection and processing under 1225. How do you distinguish that from our Gonzales case, the, the, the detainer case that your friend raised? Yes. In, in Gonzales v. Ice, there were no, there was no dispute, or in this case, excuse me, there's no dispute that inspection and processing is governed by 1225. And there's no dispute that the people that are seeking to wait in line at the border for entry into the port of entry that are members of the proposed class are seeking those procedures. In this case, an injunction would directly impose, require the government to take actions to allow people to wait in line to be inspected and processed. So it would directly impose requirements to take action, to take action to implement inspection and processing. Regardless of the authority for the CBP officer that is standing at the border. Inspection and processing is, the, the, the management of inspection and processing in this case is directly the, excuse me, the proposed injunction directly imposes requirements on the government to implement inspection and processing by allowing people to wait in line to be inspected and processed. Why wouldn't that be true in the metering case, or the pre-CBP-1 turn back cases or some of the other cases where prior to the Aleman-Gonzales case, the government took the position that these statutes didn't reach that far? I think the government still, the point is not that the statutes reach into Mexico. And although that could potentially. The effects of the statutes for purposes of 1250. Yeah. My apologies. Go ahead. The injunction in this case by requiring CBP, although that to permit individuals to wait in line to be inspected and processed is the, is operationally imposes requirements to inspect and process. Now, I, I do want to address that plaintiffs say there's no guarantee that inspection or processing would happen, but it still imposes requirements concerning inspection and processing on the government, even if those duties don't extend yet to those in Mexico. The statutory scope, it might make the question a bit easier, but it doesn't, it doesn't change the resolve that section 1232 F1 still precludes the injunction. Well, it's inspection and processing of whom people who are physically present or arriving in. We don't spend a lot of time parsing that language here, but we're trying to figure out where, what words we know. We know what's happening. We know the verb. I'm trying to figure out the noun here. Who is it applying to? People who are arriving in present and what's the government's view as to the words in 1225 that do this work? The, again, the government's view is not that 1225 applies to those in Mexico, although that issue, that issue is currently on appeal in the AOL1 case, but the government's view is not that. We're looking at the effect of the injunction on the government's implementation of 1225 and requiring or permitting individuals to wait in line at the border has the effect, it is not a collateral effect, but it has the effect of requiring the government to implement inspection and processing in a particular way. It has the effect of requiring the government to allow people to wait in line to be inspected and processed, and there's no closer relationship between those two. And I think I would like to go back to your question about the detainer case. In that case, there was a, the court's decision in that case hinged on the fact that the procedures, the detainer procedures, it found, resided in a different statute. Here, the procedures at issue reside in 1225, although the authority potentially for managing intake. So the procedures that would address the no-turnback policy, the procedures of U.S. officials directing non-citizens on the other side of the border what to do, are covered by 1225? The effect of the injunction is on procedures that are covered by 1225, and that is the government's position. But because it is an effect does not mean it is a collateral effect. And it's different because the plaintiffs aren't seeking to enforce a particular substantive immigration statute or a detainer statute that's governed by a particular different section of the code. What they're seeking to enforce is guidance that pertains to the management of intake of individuals to be processed under the procedures at 1225. Who are, by definition, outside of the country? Once they are inside of the country, under the November 2020 guidance, they are to be processed under Section, or inspected and processed under Section 1225A3 and other provisions of Section 1225. So I think that's a yes, that the effect is outside of the country and that that is a direct enough effect on 1225, 1225's coverage, that it would bring the injunction bar into play. It is a direct enough effect on the government's implementation of 1225. And again, it's, this is, the authority, the precise authority at issue is, or the source of the asserted right, is not the key inquiry for whether the injunction is covered by 1252F1 and precluded by 1252F1. It is the effect on the government's implementation of covered procedures. The question is whether it requires the government to take actions or not to take actions to carry out, implement covered procedures. Here, if the injunction directly required inspection and processing, there would be no question. And as Your Honors pointed out, other claims that plaintiffs have raised seek to directly require inspection and processing. But this, the Turnback Directive does essentially the same thing. It requires inspection and processing ultimately as to those who are waiting in line. And again, that's the, although inspection and processing does not take place until individuals are on U.S. soil, unless the non-citizen leaves, that is what, that is what takes place. That is what they are in line to do. You agree that we have no issue of declaratory relief in front of us, so we'd have no occasion to say anything about that issue with respect to F1? Yes, Your Honor. The only issue before the Court is the denial of preliminary injunctive relief. I want to point out one additional line in the guidance. The very guidance that says permitting non-citizens to wait in line is for the purpose of allowing them to proceed into the POE for processing as operational capacity permits. That's cited at Plaintiff's reply brief at 6-7 and again at 26. And that is what plaintiffs say that they are seeking to enforce through their No Turnback Directive. It expressly refers to the fact that people who are waiting in line then shall be permitted to proceed into the POE for processing as capacity permits. I also want to go back to what I stated at the beginning. Before the District Court, plaintiffs made very clear that, again, that they were seeking to impose obligations to inspect and process. They said they were seeking to enjoin defendant's failure to follow their biding guidance to inspect and process asylum seekers. Before the District Court, they did not really define what they meant by turnbacks, but they did call it a refusal to process. They said CBP has a policy under which CBP officials refuse to process asylum seekers at POEs who present without a CBP-1 appointment despite the binding guidance. And that's at 2ER-226. They also specifically equated a No Turnback Directive to a self-imposed obligation to Thus, again, this demonstrates how close the relationship is between a No Turnback Directive and requirements regarding the implementation of inspection and processing that are procedures If Your Honors have no further questions, thank you. Thank you, Counsel. We'll hear rebuttal. Just a few quick points, Your Honor. First, I want to respond to Counsel's claims that plaintiffs did not develop this argument at the District Court. That's not true at 2ER-2627, not 2ER, it's the first volume. At the District Court hearing, Counsel made clear that this was primarily about the waiting in line, and the District Court was aware and asked Counsel for the government to respond to that this is about waiting in line. But to- I want to just clarify on that point. If the policy were reframed so that the only thing that you were challenging was a violation of the policy by officers at the window who, when they get to the front of the line and they're there, they say, oh, you have no appointment, go. Is that still within the scope of the injunction that you saw? So in that case, if they say you can't wait in line, that would be within- No, they've said they've waited in line, they get to the front, they say no appointment, go. No, that would be not allowing them, because at that point, if the government says that we can't process you for operational reasons or based on capacity, that's sort of a different question about whether 1225 allows for delays based on capacity. But this specific injunction is about allowing non-citizens to wait for that inspection. So you're not asking for an injunction against the practice that I just articulated, are you? Or what's the answer to that? I think the answer is yes, they can't tell them to go away, but the injunction would not compel them to inspect that person. But what are they supposed to do with them? They're supposed to allow them to wait, because the other part of their policy is that they- They're at the front of the line, they're at the window, they're at the, the CBP officer is there and he says, no appointment, you're gone. Right, which goes to kind of the government's whole theory here is that they don't have to process people or they don't want to, but their policies are- How is the injunction complied with? What would they do to comply with the injunction? They would, under the injunction, they would allow that person to wait and then under their own policies and under the- They're standing there at the front of the line just with their hands folded waiting. That's what, that's not, you want them to be processed. Yes, Your Honor. At the front of the line, they can't turn them away, they've got to process them. That's what you're asking for. They don't have to process them immediately under our injunction. And I just want to- You're focusing on the part of the injunction that deals with the back of the line, but your injunction carries to the front of the line and the interaction at the window. That's 1225. No, Your Honor, we disagree that that's the pre-inspection and processing, allowing them to wait. And to be clear, the government agrees that section 1225 doesn't apply on the Mexican side of the border at the window. It only applies at the window. But our injunction doesn't require the inspection and that's the one step away. You said that the injunction wouldn't let them be turned away at the window. Correct, but it would be prior, it would not compel the inspection that would follow and that's the distinction. So what can the officer do to comply with the injunction other than process them? The officer can allow them to wait. Stand there. But it seems nonsensical. I mean, for how long indefinitely? So that's sort of a different question that's primarily before the AOL1 panel about how long inspection and processing can be delayed. But that's not before this court or this injunction. I will say to one point that Judge Collins raised is if you think that it wasn't clear enough at the district court, the appropriate remedy is to remand for the district court to parse this. But it was clear enough. But Mr. Nutter, I guess I'm not sure what's left of the injunction if your proposed injunction applies to non-citizens arriving or attempting to arrive at a port of entry. So they've arrived. That is what triggers the processing. So that would trigger the statutory dues, but the injunction itself, and to the extent that the proposed order was... How many steps away is that then removed from the processing if it sounds like it's less than one if they're at the window? I would say that's still one step removed because it doesn't actually require the inspection and processing. What should we make of the language then at ER 45 which states that defendants do not contest the self-imposed obligation to inspect and process such non-citizens? So what do we make of that? So that goes to the text of the government's policies and the text of the government's What is the effect of the injunction? And that's what 1252 F1 is looking at is what is the effect of the injunction? And here the effect is one step removed. I know I've gone well over my time here, but... If we're asking you questions, you're allowed to answer. But that is the case. It is one step removed under this court's precedent that Alamon Gonzalez expressly preserved in footnote four. And that's the distinction. Thank you, counsel. The case for Stargate is submitted. And with that, we are concluded our session for this morning. All rise.
judges: COLLINS, THOMAS, JOHNSTONE